UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEITH KUMMEROW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 04 C 2795 |
| | ) |
| JO ANNE B. BARNHART, | ) Magistrate Judge |
| Commissioner of Social | ) Arlander Keys |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Keith Kummerow filed this action, seeking review of the decision by the Commissioner of Social Security to deny his application for disability insurance benefits. Mr. Kummerow has filed a motion for summary judgment, seeking reversal of the Commissioner's denial, or alternatively, a remand of his claim for further proceedings. The Commissioner has filed a cross-motion for summary judgment. For the reasons set forth below, the Court grants Mr. Kummerow's motion, denies the Commissioner's motion, and remands the case to the Commissioner for further proceedings.

## FACTS & PROCEDURAL HISTORY

On October 5, 2001, Keith Kummerow filed an application for disability insurance benefits, alleging that he became disabled on August 2, 2000 because of a limited range of motion and weakness in his left arm, which he claimed limited his ability to lift, push or pull more than twenty pounds. Record at 51, 70.

The disability examiner, Dr. James Graham, diagnosed Mr. Kummerow with "sprains and strains - all types," and the Administration denied his application; in a December 12, 2001 letter, the Administration advised Mr. Kummerow that, although it recognized that his condition "does cause some restrictions in your ability to function," it nonetheless concluded that he should be able to return to factory type work. Record at 28-31.

Mr. Kummerow filed a request for reconsideration, claiming the same conditions and limitations claimed in his initial application, but adding increased depression as well. Record at 94. Mr. Kummerow's request for reconsideration was denied on May 3, 2002. Record at 27. Mr. Kummerow then requested a hearing before an administrative law judge ("ALJ"); in his request, he claimed that he could not use his left hand, and that any use of his left arm caused him pain. Record at 38. In addition, he claimed that he suffered from an overactive small bowel, a pituitary tumor, high blood pressure, depression, and reflux disease. Record at 38.

Mr. Kummerow's case was assigned to ALJ Peter J. Caras, who held a hearing on September 4, 2003. Record at 268. At the hearing, Mr. Kummerow, who was represented by counsel, testified first. He testified that he was born on November 29, 1957, that he has had ten years of education, and that he lives alone, in an apartment downstairs from his mother. Record at 274, 288, 305.

He testified that he is right-handed. Record at 288.

With respect to his daily activities and routines, Mr. Kummerow testified that he is able to button his own shirts and generally dress himself, though he sometimes has trouble with his socks, and he can only wear shoes that close with velcro straps because he is unable to tie shoelaces. Record at 288-89. He testified that, after cataract surgery and with glasses, his vision is basically fine; he is able to drive himself, walk his dog, grocery shop, cook, do laundry, and keep his house somewhat clean. Record at 290-91, 294, 301-02. He testified that he sometimes drives to visit a friend, and that he used to like to go hunting and fishing, but he is no longer able to do so. Record at 291, 293-94, 302.

With regard to his work history, Mr. Kummerow testified that he worked for BWD Automotive from 1980 until 1998, when the company went out of business. Record at 274-75. He testified that, for the first nine years, he worked in BWD's factory, doing odd jobs; thereafter, he worked in the warehouse, doing "pick orders, load truck," which basically involved the work of an order filler, material handler, and hand packager, all combined. Record at 275. He testified that, after he fell off a ladder in 1996 and broke his arm and dislocated his elbow – the injuries that led him to file for disability insurance benefits – he could only work with the lighter weight products in the warehouse.

3

Record at 275-76. When asked by the ALJ whether he could still do any of the warehouse jobs, he testified that he could, "as long as it's light work." Record at 276.

Mr. Kummerow also testified that, after BWD went out of business, he worked at Minnie's Machine full-time for a period of a year and a half. Record at 277. He testified that he left that job because Minnie's "lost contracts for what I was doing, plus they were also moving the equipment out because they were going to close that facility." Record at 277. When asked whether he thought he could still do the work he did at Minnie's, Mr. Kummerow testified that he "probably could" if he "could find somebody to hire me." Record at 278. On further questioning from his attorney, he testified that, although he thought he was capable of doing those jobs, he admitted that his previous employer might not have agreed with that assessment. Record at 298. For example, he testified that, in his job at Minnie's, which involved pulling bars out of a lathe, the company wanted him to pull out 800 bars in an eight-hour day, but he could only do 300 to 400 in an eight-hour day, "depending on how things ran." Record at 297. Mr. Kummerow testified that, since losing his job at Minnie's, he has continued to look for work and to apply for jobs. Record at 281-82.

Mr. Kummerow testified that, after working at Minnie's, he got a job at J.C. Whitney, stacking material from floor to

4

ceiling in a trailer. Record at 281. He testified that he worked there for a day and a half but couldn't handle it, and so he quit. Record at 281. He testified that he also worked at a company called Field Container for about five days, but he left because a co-worker implied that he was not pulling his weight. Record at 298. He testified that, because he only has one good arm, he is limited to doing light work, like the kind he did at Minnie's. Record at 282.

With respect to his health issues, Mr. Kummerow testified that he had claimed disability because of the arm and elbow injuries he suffered when he fell off a ladder in April 1996. He testified that he also suffers from high blood pressure, which is controlled with medication; he testified that he takes his blood pressure daily, and that the readings are consistently in the normal range. Record at 292-93. Mr. Kummerow testified that he takes Cyclobenzaprine about one to two times each week, and that he also takes Synthroid, Prevacid, and Zoloft, as well as medication every now and then when his back "acts up." Record at 283-84. With respect to his back, he testified he has back problems, which make it hard for him to bend and to get up when he kneels; he testified that his back problems have worsened over time. Record at 294-95.

In addition, Mr. Kummerow testified that he takes sinus medicine and Tylenol for headaches about three to four times a

week. Record at 284, 299. He stated that these headaches cause a throbbing pain, originating in the middle of his head and growing around to the top and back of his head. Record at 300. He testified that on a scale of one to ten, his headaches range from a three to a four. Record at 300. Early in his testimony, Mr. Kummerow stated that he had no identifiable problems or side effects with the various medications he took; however, he later stated that his muscle relaxer medication makes him drowsy and tired. Record at 284, 301.

Mr. Kummerow testified that his biggest problem is his left arm and elbow. Record at 284-85. He explained that he feels shooting pain from his elbow up to three or four times each day, and that his pain increases when he tries to use his arm. Record at 285-86. He testified that movement aggravates the pain. Record at 290, 302. He stated that, although it varies, when he tries to work with something, the pain sets in after about a half hour and he has to stop working. Record at 302. Occasionally, he testified, he feels a quick shot of pain just by twisting the wrong way or by putting his elbow on a table. Record at 303. Mr. Kummerow stated that the pain makes it hard for him to sleep, and that it frequently wakes him up. Record at 286.

At the hearing, Mr. Kummerow demonstrated that he cannot extend his arm beyond a ninety degree angle, though he is able to raise his arm above shoulder level from the front and side.

Record at 286-87. He stated that he uses his left arm for support. Record at 289. Mr. Kummerow testified that he can no longer afford treatment for his left elbow; however, he testified that when his elbow really starts to bother him, he goes to see Dr. Harney, his local therapist, who prescribes whatever medicine he happens to have on hand; Mr. Kummerow testified that the medicine generally helps to ease the pain. Record at 285-86, 289-90.

Mr. Kummerow explained that when he is sitting down, he places his right arm on the table and leans into it. Record at 303. If he is driving, Mr. Kummerow testified, his left arm basically sits in his lap. Record at 303. When he is standing or walking, Mr. Kummerow testified, his left arm hangs at a ninety degree angle; he demonstrated this, and showed how he hooks his thumb in his pants to hold his arm in place. Record at 303-04. If he didn't do this, he testified, his arm would just hang down and would start to bother him. Record at 304. He Kummerow testified that he is unable to rotate his left hand. Record at 287.

In addition, Mr. Kummerow testified that he suffers from a brain tumor, which is also referred to in the record as a pituitary tumor; he stated that his doctors partially removed the tumor, but that he is supposed to get an MRI "every so many years" to keep an eye on the part of the tumor that remains.

Record at 291. Mr. Kummerow testified that the partial removal of his pituitary tumor caused him to feel like a different person. Record at 303. He stated that he "lost his drive" and that this led, in part, to his divorce. Record at 303.

In addition to his physical problems, Mr. Kummerow testified that he also suffers from depression, and that his doctor had prescribed Zoloft to treat the problem. Record at 291. Mr. Kummerow stated that he thinks his depression stems from his inability to get a job and from his divorce in 1998. Record at 292. Mr. Kummerow also stated that he has problems with his memory. Record at 292. He explained that, sometimes he would leave one room to get something in another room and then forget why he did that. Record at 292. Mr. Kummerow could not recall what medicine he was taking for his memory. Record at 292.

After Mr. Kummerow testified, the ALJ called Jennie Chin, a vocational expert ("VE"), to testify. Ms. Chin first testified that Mr. Kummerow's previous positions at BWD would be classified as an order filler, a hand packager and a material handler; his job at Minnie's was basically that of a lathe tender. Record at 279-80. Ms. Chin testified that the lathe tender position is considered to be a semi-skilled, medium exertion job, though she noted that Mr. Kummerow had described the job as a light exertion job. Record at 280. She testified that the order filler job Mr. Kummerow did at BWD would be characterized as a light exertion

job, though she said nothing about the skill level involved in that job. Record at 280.

The ALJ asked Ms. Chin to consider the employability of a hypothetical claimant who: (1) had ten years of education; (2) was able to work jobs only at the light and sedentary exertional level; (3) was unable to use ladders, ropes, or scaffolds; (4) had some ability to do occasional climbing, balancing, stooping, kneeling, crouching, and crawling; (5) must avoid concentrated exposure to unprotected heights and unprotected hazardous machinery; (6) was right-hand dominant; (7) could not fully extend or flex his left arm; (8) could do occasional gripping; (9) had minimal left-hand rotation; (10) had occasional deficiencies of concentration or attention; and (11) could not perform any significant memorization. Record at 306. Ms. Chin testified that, given these limitations, the claimant should be able to do the order filler job Mr. Kummerow previously did for BWD because that job required only a light level of exertion. Record at 306. Ms. Chin testified, however, that he would not be able to perform any of the other jobs he had previously held because those jobs were considered to be medium or heavy exertion jobs.

Looking beyond positions within Mr. Kummerow's past work history, the VE testified that a claimant with the limitations and restrictions noted by the ALJ would be capable of performing

9

three jobs: assembler, of which there are 24,420 positions available in Illinois at the light level and 5,120 positions available at the sedentary level; hand packager/handler, of which there are 12,911 positions available at the light level and 453 positions available at the sedentary level; and light cleaner, of which there are 8,242 positions available at the light level and no positions available at the sedentary level. Record at 306-07.

On questioning from Mr. Kummerow's attorney, the VE testified that the order filler job would be consistent with the ALJ's limitation of occasional left-hand gripping and minimal left-hand rotation, but that it would definitely require the use of his left arm and hand. Record at 307. The VE testified that the job would require Mr. Kummerow to read an order and then go get the parts or whatever he was looking for; she testified that this would require frequent reaching, lifting and pulling boxes or bins of objects weighing up to twenty pounds; she testified that the boxes and bins could be stored above shoulder height, or closer to ground level. Record at 308. When asked how Mr. Kummerow could pull down boxes or bins from higher storage without the use of his left arm, the VE testified that he could use his left arm for support, and that, in any event, in her estimation, the ALJ's restrictions permitted occasional use of the left arm and hand, including occasional reaching above shoulder height. Record at 308-11. The VE admitted, however,

10

that if Mr. Kummerow's arm limitations slowed him down to the point where he was not meeting his employer's production requirements, then he would not be able to hold the job. Record at 311.

With respect to the light cleaner job, the VE testified that any mopping or sweeping required in the job could be done with one hand, though she was assuming, given the ALJ's instructions, that Mr. Kummerow had use of his left arm and hand, he just couldn't fully extend it. Record at 312. The VE testified that Mr. Kummerow could sort of prop the broom or mop on his shoulder and then extend his good arm to perform the task. Record at 313. She also testified that the light cleaner job would require occasional bending – every time he sweeps, for example – which was not a problem as far as she was concerned because the ALJ gave her no bending restriction. Record at 313. Although the transcript of the testimony is partially inaudible, it appears that the VE admitted that, if bending were a problem for Mr. Kummerow, the light cleaning job might be ruled out. Record at 313.

With respect to the hand packager job, the VE testified that Mr. Kummerow would need to use his left hand and arm for support or to stabilize whatever he was packaging. Record at 314. She testified that Mr. Kummerow's weak grip would not be a problem for this job, unless his restrictions caused him to perform so

11

slowly that he fell below the employer's productions requirements, in which case he would not be able to hold the job. Record at 314-15. On this last score, the VE admitted that, if Mr. Kummerow was unable to meet his employer's production or performance expectations, then he would not be able to hold any of the jobs she identified. Record at 315. After the VE testified, the ALJ adjourned the hearing and closed the record.

In addition to the hearing testimony, the record before the ALJ contained an abundance of medical information. With respect to the injuries that precipitated the disability benefits application, the record shows that, on April 28, 1996, Mr. Kummerow was brought to the Community Hospital of Ottawa by ambulance after he fell off a ladder. Record at 252. Mr. Kummerow had been standing on the ladder, about ten feet high, when the legs of the ladder slipped out from underneath him, and he fell to the floor. Record at 252. Mr. Kummerow did not lose consciousness, but he complained of left elbow pain, left rib pain, and pain in the lower part of his right leg. Record at 252. A radiological report taken at the hospital that day revealed that Mr. Kummerow's left elbow was dislocated. Record at 255. A pathology report taken on May 6, 1996 confirmed the dislocation of the left elbow; the record also confirmed that his arm was fractured in several places, with pulverized bone fragments present. Record at 103, 249.

12

On May 28, 1996, Mr. Kummerow visited Scott Cordes, M.D., an orthopedic surgeon at the Northwestern Center for Orthopedics. Mr. Kummerow explained that he had fallen from a ladder the previous month, and that, as a result, he had suffered a broken arm and a dislocated elbow. After examining him, Dr. Cordes warned Mr. Kummerow that he would most likely have a permanently stiff elbow, given the extent of the injury, and that he was unlikely to regain full flexion or extension of his elbow. Furthermore, Dr. Cordes informed Mr. Kummerow that he would likely not regain much pronation or supination at the elbow.

On June 3, 1996, Dr. Cordes proceeded with an open reduction to Mr. Kummerow's left elbow, removed loose fragments within the elbow joint, and was able to maintain Mr. Kummerow's elbow in a reduced position. However, even with extensive physical therapy, Mr. Kummerow's range of motion plateaued with a range limited from sixty to ninety degrees. Dr. Cordes then applied a long arm cast to Mr. Kummerow. Mr. Kummerow complained that the injury to his elbow was causing him difficulty at work because his job involved lifting.

On April 27, 1998, Mr. Kummerow returned to Northwestern Center for Orthopedics to undergo anterior and posterior capsuiotomies, with excision of heterotopic bone and radial resection of adhesions. Mr. Kummerow was able to obtain interoperatively eighty degrees of supination and ninety degrees

13

of pronation, with a return of full flexion at the elbow and within forty degrees of full extension. Mr. Kummerow was then splinted in the extension mode and transferred to the Recovery Room.

On May 12, 1998, Mr. Kummerow returned to Dr. Cordes at Northwestern Center for Orthopedics to have his sutures removed. Mr. Kummerow's wounds were healing, with no evidence of infection. Mr. Kummerow complained of pain, requiring Vicodin. Dr. Cordes stressed to Mr. Kummerow the importance of returning to aggressive physical therapy, and he wrote Mr. Kummerow a prescription for Vicodin. Mr. Kummerow was making gains with his therapy, but with some loss of what he had obtained interoperatively.

By May 23, 1998, Mr. Kummerow had improved. Mr. Kummerow's flexion was that of 113 degrees actively and 130 degrees passively. He had thirty-four degrees passive extension contracture. Mr. Kummerow could pronate passively to forty-three degrees, but there had not been much change in the supination. Dr. Cordes stressed to Mr. Kummerow the importance of continued therapy, but warned that he was unlikely to achieve full range of motion in the elbow.

During Mr. Kummerow's visit to Dr. Cordes on August 25, 1998, Mr. Kummerow described pain ranging anywhere from a two to six on a scale of one to ten. Dr. Cordes noted that Mr.

14

Kummerow's flexion had improved, but that his extension had not. Mr. Kummerow's pronation had improved to forty-five degrees actively and seventy-five degrees passively, with no function supination noted beyond eighteen degrees. Mr. Kummerow stated that he was tolerating work, but that he was actively seeking a different job because the plant where he worked was closing. Mr. Kummerow was still requiring the use of Vicodin, but Dr. Cordes felt that, at this point, Mr. Kummerow was near maximum medical improvement.

Dr. Cordes noted that Mr. Kummerow was not a candidate for total elbow replacement because it would not improve his functional range of motion, and it would lead to early failure in Mr. Kummerow as a laborer. Dr. Cordes also noted that Mr. Kummerow's injury, even without the elbow replacement, would likely affect his ability to work. Dr. Cordes observed that Mr. Kummerow would be better suited for a sedentary or assembly line position that did not require heavy lifting or repetitive activities with his left upper arm.

On June 25, 1998, Mr. Kummerow visited Dr. Michael Harney, his general practitioner at OSF St. Francis Medical Center. Dr. Harney noted that Mr. Kummerow suffered from a permanent disability of his left elbow. During this visit, Mr. Kummerow explained to Dr. Harney that his wife wanted a divorce. At the time of this visit, Mr. Kummerow's medications included Vicodin,

15

Prevacid, and Synthroid. Record at 222. Mr. Kummerow
subsequently visited Dr. Harney on September 8, 1998, and Mr.
Kummerow complained that his left elbow was sore. Record at 221.
Dr. Harney noted that Mr. Kummerow had a "frozen elbow." Record
at 221. At this time, Mr. Kummerow was taking Prevacid. Record
at 221.

On his next visit to Dr. Harney, on October 23, 2001, Mr.
Kummerow explained that he felt pain and numbness in his left
arm. Dr. Harney noted that Mr. Kummerow was unable to fully
extend his arm ninety-five degrees, that he had forty-five
degrees flexion, that he was unable to supinate his left wrist,
and that he had a frozen elbow.

On November 30, 2001, Mr. Kummerow underwent a Physical
Residual Functional Capacity Assessment. Record at 116-123. Mr.
Kummerow's primary diagnosis on this report was left arm pain.
Record at 116. Mr. Kummerow complained that he had left arm pain
and numbness. Record at 123. Non-examining consultative
physician Dr. James Grabam noted that Mr. Kummerow's elbow
extension was ninety-five degrees, and his flexion was forty-five
degrees. Record at 123. Dr. Grabam concluded that Mr. Kummerow
should be capable of medium work activity, with a limitation on
overhead reaching on the left side. Record at 123.

In addition to his elbow injury, Mr. Kummerow suffers from a
brain tumor (sometimes referred to as a pituitary tumor), which

16

was diagnosed after Mr. Kummerow began having problems with his vision during the latter part of 1996. Record at 170-71. Mr. Kummerow explained that, when he suddenly became unable to see the upper portion of shelves at the warehouse where he worked, he went to see Dr. John P. Henderson at OSF Saint Francis Medical Center in Peoria; on January 30, 1997, Dr. Henderson did an MRI, which revealed a large mass in his brain and extending down into his sinus cavities. Record at 170-71.

In addition, Dr. Richard Lister, a neurosurgeon at Associated University, evaluated Mr. Kummerow for decreased visual acuity. On February 3, 1997, Dr. Lister wrote that he found a large anterior skull based tumor that mostly looked like meningioma. Dr. Lister scheduled Mr. Kummerow for an angiogram on February 17, 1997, with surgery the following day to "debulk the mass." Record at 163. The surgery was subsequently canceled, however, when Dr. Lister discovered that the mass was actually the result of a pituitary gland malfunction. Record at 170-71, 200.

On February 14, 1997, Mr. Kummerow saw Dr. Thomas Dorsch, an endocrinologist, for his tumor and pituitary problem. Record at 167-68. After evaluating Mr. Kummerow, Dr. Dorsch started Mr. Kummerow on Parlodel, which considerably improved the vision problems Mr. Kummerow had been experiencing. Record at 167-68, 170-171, 200. Two weeks later, however, Mr. Kummerow

17

experienced a cerebrospinal fluid ("CSF") leakage caused by the shrinkage of his tumor. Record at 170-171, 186, 200. Mr. Kummerow was admitted to OSF Saint Francis Medical Center on February 25, 1997, and underwent surgery to repair the CSF leakage on February 27, 1997. Record at 138-39, 195. Mr. Kummerow was discharged from the medical center on March 9, 1997. He was advised not to drive, lift heavy objects, strain, cough, sneeze, or blow his nose. Record at 198-99. Mr. Kummerow was prescribed Vicodin and Synthroid and was instructed to continue his Parlodel treatment. Record at 198-99.

On March 31, 1997, Mr. Kummerow was again admitted to OSF Saint Francis Medical Center because of a recurrent/second CSF leakage. Record at 141, 186. Dr. Henderson diagnosed Mr. Kummerow as having "CSF rhinorrhea secondary to a macroprolactinoma of pituitary gland status post-operatively." Record at 141, 183. Mr. Kummerow underwent an operation involving the placement of a lumbar drain, and was discharged on April 18, 1997. Record at 141, 183, 186.

On July 22, 1997, Dr. Neelima Kabre, a radiation oncologist, conducted a physical examination of Mr. Kummerow. Record at 170-71. The examination revealed that Mr. Kummerow was in no apparent distress, his oral cavity and oropharynx were normal, and he had no palpable lymphadenopathy in the neck or axilla. Record at 170-71. In addition, Mr. Kummerow's chest was clear to

18

auscultation and percussion and his abdomen was soft. Record at
170-71. Given Mr. Kummerow's macroprolactinoma involving the
pituitary gland, Dr. Kabre recommended a total of about 5,000 cGy
to his pituitary gland using multiple ports directed to the
pituitary. Record at 170-71.

On July 30, 1997, Mr. Kummerow began external beam radiation
therapy to cover the pituitary. Record at 140. He completed
this course of treatment on September 8, 1997. Record at 140.
Dr. Kabre noted that Mr. Kummerow tolerated the treatments fairly
well. At this point, Mr. Kummerow complained of severe fatigue
throughout the day. Record at 140. During Mr. Kummerow's visit
to Dr. Harney on December 12, 1997, Dr. Harney noted that Mr.
Kummerow suffered from a pituitary tumor.

Dr. Lister evaluated Mr. Kummerow a few years later on
January 10, 2000. Record at 153. Mr. Kummerow's scan revealed a
small area of persistent or recurrent tumor, but there was no
significant mass effect. Record at 153. Dr. Lister did not
recommend another surgery, but he strongly recommended an
evaluation by an endocrinologist. Record at 153. Dr. Lister
offered to help Mr. Kummerow get an appointment with Dr. Dorsch,
the endocrinologist who had previously cared for him. Record at
153.

Mr. Kummerow saw Dr. Dorsch on June 26, 2000. Record at
152. At this time, Mr. Kummerow complained of fatigue and poor

19

energy, and he was taking 150 mcg of levothyroxine daily. Record
at 152. After conducting lab studies, Dr. Dorsch concluded that
Mr. Kummerow had persistent elevation in his prolactin and an
invasive pituitary macroadenoma. Record at 152. Dr. Dorsch
recommended that Mr. Kummerow take 0.5 mg of Dostinex twice
weekly; however, he was uncertain as to whether this would cause
any improvement in Mr. Kummerow's symptoms. Record at 152. Dr.
Dorsch noted concern that Mr. Kummerow's pituitary tumor
continued to grow despite surgery and radiation therapy. Record
at 152. Dr. Harney, who continued to see Mr. Kummerow throughout
2001, also noted the persistence of the tumor and its attendant
affects. See, e.g., record at 147.

In addition to his other health problems, Mr. Kummerow has
suffered back complications since 1995. On Mr. Kummerow's visit
to Dr. Harney at the OSF St. Francis Medical Center in Peoria on
May 3, 1995, Dr. Harney noted that Mr. Kummerow suffered from
back pain and increased pain on the right side due to lifting,
pulling, and twisting at work. In addition, Mr. Kummerow had
flattening of the lumbar spine and acute spasms. On that
occasion, Dr. Harney prescribed Kelafin and Fioricet to treat Mr.
Kummerow's back condition. Record at 227. On June 1, 1999, Dr.
Harney noted that Mr. Kummerow suffered from sharp lumbar back
pain, and that the back pain persisted on Mr. Kummerow's visit on
June 26, 1999. On this occasion, Dr. Harney prescribed

20

Vicoprofen. Record at 217. Mr. Kummerow complained to Dr. Harney of back pain on April 21, 2000; May 23, 2000; and July 14, 2000. Record at 208-09. During his visit to Dr. Harney on March 5, 2002, Mr. Kummerow explained that his back was "really aggravated." Record at 207.

On August 3, 2003, Mr. Kummerow arrived at the Community Hospital of Ottawa complaining of back problems because he had moved a lot of stuff the day before. The ER report completed by Dr. Harris stated that Mr. Kummerow's symptoms were moderate and exacerbated by motion. Dr. Harris observed that Mr. Kummerow's back was tender in the paralumbar area, and he diagnosed Mr. Kummerow with back pain. Dr. Harris prescribed Mr. Kummerow Valium and Vicodin. An August 4, 2003 radiological report revealed that Mr. Kummerow suffered from mild scoliosis of the upper lumbar spine and degenerative arthritic changes in the facet joints, but that Mr. Kummerow's lumbosacral spine series appeared normal.

The record shows that, over the years, Mr. Kummerow has suffered from a number of other medical problems, including high blood pressure, depression, hypothyroidism, stomach problems, and generalized joint pain; most recently, on June 13, 2003, Dr. Harney diagnosed Mr. Kummerow with left hip tendinitis, and he prescribed Vioxx to treat this condition. Additionally, Mr. Kummerow has suffered from depression since 1997, likely due to

21

his divorce and inability to get a job. Dr. Harney has treated the depression with a variety of drugs, including Paxil, Zoloft, Prozac, Celexa, Limbitrol, and Remeron.

In addition to these drugs, Dr. Harney prescribed Synthroid to treat Mr. Kummerow's hypothyroidism; Zantac and Prevacid to treat Mr. Kummerow's irritable bowel syndrome and stomach problems; and, at various times, Vicodin, Vicoprofren, Ultram, Vioxx, Prilosec, Relefan, and Bextra to treat Mr. Kummerow's pain. Record at 145-149, 202-209.

The ALJ issued his decision on December 16, 2003; he determined that Mr. Kummerow was not disabled, and therefore denied his claim for benefits. With respect to Mr. Kummerow's residual functional capacity, the ALJ determined that the record did not support the State Agency's physicians' conclusion that Mr. Kummerow could perform medium work activity; instead, the ALJ concluded, "the record is more consistent with a finding that the claimant could work at the light level of exertion." Record at 19. The ALJ determined that Mr. Kummerow could lift and carry 20 pounds occasionally and 10 pounds frequently and engage in frequent walking or standing; he determined that Mr. Kummerow could not climb ladders, ropes or scaffolds, could only occasionally climb, balance, stoop, kneel, crouch or crawl, should avoid concentrated exposure to unprotected heights or unprotected hazardous machinery and can do only limited reaching

22

with his left arm, and occasional gripping with his left hand.
Record at 19. Taking into account his mental condition as well,
the ALJ determined that Mr. Kummerow "could perform unskilled
work with vocational deficits, concentration and attention, which
does not require significant memorization." Record at 20. He
determined that Mr. Kummerow was limited to unskilled light work,
with these non-exertional limitations. Id. The ALJ concluded as
follows:

> With these limitations, vocational expert Jennie Chin
> testified that the claimant could return to past
> relevant work as a lathe tender. That work was
> performed at the light level of exertion, and the
> claimant testified that he was capable of performing
> similar work and was looking [f]or similar work
> currently.

Record at 20. The ALJ determined that, in the alternative, based
on the testimony of the VE, Mr. Kummerow could perform other work
- specifically, that of an assembler, hand packager or cleaner -
existing in significant numbers. Record at 20.

Mr. Kummerow filed a request with the Social Security
Appeals Council seeking review of the ALJ's decision. Record at
7. The Appeals Council denied the request on March 5, 2004,
making the ALJ's decision the final decision of the Commissioner.
Record at 4.

## DISCUSSION

A claimant is entitled to Disability Insurance Benefits if
he establishes "disability" as defined by the Social Security

23

Act. The social security regulations provide a five-step sequential evaluation process. Under the regulations, the ALJ must evaluate, in sequence: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing work in the national economy. If an ALJ concludes at any step that the claimant is or is not disabled, then he need not proceed to the next step in the sequence. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th. Cir. 2004). If a claimant proceeds past step four, the burden shifts to the Commissioner to show that the claimant is capable of successfully performing a significant number of jobs available in the national economy. *Id.* (citing *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)).

A case will be remanded if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). A reviewing district court shall reverse the ALJ's decision only if it is not supported by substantial evidence or if it is the result of legal error. 42 U.S.C. §405(g); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002)). Although the

24

reviewing district court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner," it nevertheless conducts a "critical review of the evidence" before deciding whether the decision of the Commissioner should be affirmed. *Lopez*, 336 F.3d at 539 (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). Furthermore, when denying a claimant benefits, an ALJ must build an "accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.

Applying the five-step process described above, the ALJ first determined that Mr. Kummerow had not engaged in substantial gainful activity since the alleged onset date of disability, August 2, 2000. Record at 17. At step two, the ALJ found that Mr. Kummerow's severe impairments included high blood pressure, a history of pituitary gland resection, a history of left elbow injury, and depression. Record at 17. However, the ALJ found, at step three, that Mr. Kummerow did not have an impairment or combination of impairments that met or equaled one of the impairments listed in Appendix 1, Subpart P, of Regulations No. 4. Record at 17. The ALJ found that Mr. Kummerow's functional restrictions failed to establish a physical or mental disabling condition. Record at 18-20. And, in doing so, he noted that Mr. Kummerow's impairments do not prevent all work activity, and that the medical evidence did not support the degree of symptoms

25

asserted by Mr. Kummerow. Record at 18. The ALJ also noted that "[r]elevant credibility factors fail to support a finding of complete disability"; according to the ALJ, Mr. Kummerow was "mostly credible, but the record is not consistent with a finding of complete disability." Record at 19. Here, the ALJ noted that Mr. Kummerow admitted that he had been looking for work, that he could shop, cook, drive and walk his dog. Id.

At step four, the ALJ concluded that Mr. Kummerow had the residual functional capacity to return to his past relevant work as a lathe tender. Record at 20. More specifically, the ALJ determined that, despite his physical and mental impairments, he could perform work at the light level of exertion, which would require lifting and carrying 20 pounds at a time and 10 pounds frequently, as well as frequent standing and walking; he cannot climb ladders, ropes or scaffolds, can only occasionally climb, balance, stoop, kneel, crouch or crawl, should avoid concentrated exposure to unprotected heights or unprotected hazardous machinery, can do only limited reaching with his left arm and occasional gripping with his left hand. Record at 19. In summary, the ALJ determined, Mr. Kummerow was limited to "unskilled light work, with the non-exertional limitations listed above." Record at 20.

Though not required under the regulations, the ALJ went on to step five. There, he found that, in addition to his past

26

relevant work, Mr. Kummerow could perform other work existing in significant numbers – specifically, the jobs of assembler, hand packager and cleaner. Record at 20. The ALJ noted that his findings at step five – as well as those at step four, for the most part – were based predominantly on the testimony of vocational expert Jennie Chin. Record at 20.

Mr. Kummerow argues that the ALJ's decision should be reversed or remanded for several reasons. He first argues that, in assessing Mr. Kummerow's residual functional capacity, the ALJ failed to address important evidence of Mr. Kummerow's disability. He also argues that the ALJ's hypothetical to the VE at the hearing on September 4, 2003 failed to include all of the functional limitations supported in the record, thereby making the VE's testimony concerning what Mr. Kummerow could or could not do unreliable; tangentially, he argues that, given the unreliability of the VE's testimony, the ALJ's findings at steps four and five – which are admittedly based upon the VE's testimony, are erroneous. Mr. Kummerow also argues that the ALJ's findings about what jobs he could and could not do are inconsistent with the VE's testimony and with the classifications and descriptions of those jobs provided in the *Dictionary of Occupational Titles* ("DOT"). The Court will consider each argument in turn.

Mr. Kummerow first argues that the ALJ failed to consider

his back problems in assessing his residual functional capacity, and that the ALJ failed to explain why he was not considering this evidence. After discussing Mr. Kummerow's left arm problems, the ALJ wrote in his decision that

[t]he only other physical evidence of record is an emergency room visit from August 2003. The claimant was complaining of back pain after moving many items at home the previous day. He had some tenderness in his spine, and was treated and released.

Record at 18. The record does show that, on August 3, 2003, Mr. Kummerow went to the emergency room at the Community Hospital of Ottawa, complaining that his back was hurting because he had "moved a lot of stuff yesterday." Record at 264. The ER records show that Mr. Kummerow's back was "tender in the paralumbar area," that his symptoms were "moderate, exacerbated by motion"; he was diagnosed with "back pain," given IM Morphine and Valium, and discharged with instructions to follow up if his symptoms worsened. *Id.* But the medical records clearly do not support the suggestion that this was a one-time, situational, easily-resolved problem. In fact, a radiological report from the next day, August 4, 2003, shows that Mr. Kummerow had "mild scoliosis of the upper lumbar spine with convexity to the right" and "degenerative arthritic changes in the facet joints." Record at 263. And the record contains an abundance of medical records clearly demonstrating that Mr. Kummerow has suffered back pain since 1995. May 3, 1995 progress notes indicate that, on that

28

date, Mr. Kummerow complained of back problems, specifically increased pain on the right side from lifting, pulling, and twisting at work; flattening of the lumbar spine and acute spasms were noted. Record at 227. June 1, 1999 progress notes indicate that Mr. Kummerow suffered sharp lumbar back pain and that the back pain persisted through the end of June. Record at 217. Mr. Kummerow complained of lumbar spasms on October 25, 1999, and he complained of back pain on February 15, 2000, April 21, 2000, May 23, 2000, and July 14, 2000. Record at 208-10, 213. On March 5, 2002, Mr. Kummerow told his doctor that his back was "really aggravated." Record at 207. The ALJ does not appear to have considered any of this evidence; indeed, nothing in the ALJ's decision reflects any consideration or analysis of what appears to be a long-standing back problem.

It is true that Mr. Kummerow claims a disability onset date of August 2, 2000, long after his back problems began. But, even if the ALJ limited his analysis of Mr. Kummerow's back problems to the period after August 2, 2000, there is still a fair amount of medical evidence supporting Mr. Kummerow's back complaints, as described above. The ALJ was wrong to disregard this evidence, without at least offering some explanation as to why he was doing so.

Mr. Kummerow next argues that the ALJ failed to include his back problems in the hypothetical posed to the vocational expert.

29

As Mr. Kummerow correctly notes, ordinarily, the ALJ's hypothetical to the VE should include "*all* limitations supported by the medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (citing *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993); *Gilbert v. Apfel*, 175 F.3d 602, 604 (8th Cir. 1999); *Winfrey v. Chater*, 92 F.3d 1017, 1025 n. 5 (10th Cir. 1996). This rule ensures that the VE is aware of all of the applicant's limitations when determining what jobs the applicant is capable of performing. *Steele*, 290 F.3d at 942. At the hearing before the ALJ, Mr. Kummerow testified that he had back pain, and that his back was "getting worse as time goes." Record at 295. He testified that he had scoliosis, which he thought his doctor had said was caused by his back spasms. Record at 296. He also testified that, because of his back, he has trouble bending over, and that, if he gets down on his knees, he has difficulty getting back up to standing. Record at 294-95. This testimony is unrebutted. And the record includes the medical evidence of Mr. Kummerow's regular complaints of back pain. Yet the ALJ posed a hypothetical to the VE that failed even to mention any back problems or limitations on bending. In fact, on questioning from Mr. Kummerow's attorney, the VE specifically said that her testimony assumed no restriction on Mr. Kummerow's ability to bend. Record at 313. And, although the transcript of the hearing shows that the VE's testimony was partially inaudible

30

on this issue, it appears that the VE believed that a restriction on bending would eliminate at least some of the jobs she said Mr. Kummerow could do. *Id.*

A failure to consider a claimant's impairment may be remedied if the record indicates that the VE reviewed all of the claimant's relevant medical records prior to the hearing. *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Ragsdale v. Shalala*, 53 F.3d 816, 818-821 (7th Cir. 1995). Here, however, nothing in the record indicates that the VE reviewed Mr. Kummerow's medical records before the hearing or that she otherwise accounted for Mr. Kummerow's back impairment when responding to the hypothetical. When a VE's testimony is not supported by certain medical evidence that fairly appears in the record, the case should be remanded to incorporate this evidence in determining the claimant's ability to perform work in the national economy. *See Brown v. Chater*, 913 F. Supp. 1210, 1216 (N.D. Ill. 1996). Because Mr. Kummerow testified to his back problems and there are medical records supporting his allegations, the ALJ should have ensured that the VE consider this injury when responding to the hypothetical. Because the VE did not consider this injury, her testimony concerning the hypothetical claimant is necessarily flawed and the ALJ's reliance on that testimony is equally flawed.

Tangentially, Mr. Kummerow next argues that the ALJ's

decision failed to address his back injury. When a VE's hypothetical fails to include all of the claimant's impairments, the social security regulations nevertheless require that an ALJ consider all evidence in the case record when making a determination as to whether the claimant is disabled. 20 C.F.R. 404.1545(a)(3). In addition, the total body of evidence must have been given balanced consideration. *Aidinovski v. Apfel*, 27 F. Supp. 2d 1097, 1103 (N.D. Ill. 1998). Here, despite significant attention in the medical records, the ALJ was largely dismissive of Mr. Kummerow's back problems; he addressed only the August 2003 admission to the ER and, even then, failed to discuss other relevant evidence contained in the ER report. While an ALJ may have a sound basis for rejecting evidence that bolsters a claim, the record must present a "clear articulation of the reason [the ALJ] rejected the evidence." *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 392 (7th Cir. 1992)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984)). The medical records relating to Mr. Kummerow's back problems demonstrate that this injury could affect his ability to function. Yet, the ALJ failed to consider or discuss favorable records and even minimized the severity of the medical evidence that he did discuss. Though progress notes dating from the year 2000 to 2003 are replete with Mr. Kummerow's back complaints, the ALJ discussed only his August 2003 admission to the ER, without

any explanation for the omission.

In response to Mr. Kummerow's argument that the ALJ erroneously failed to include his back impairment, the Commissioner has attempted to support the ALJ's decision by asserting that the relevant medical records from August 2, 2000 to December 16, 2003 failed to show that Mr. Kummerow suffered from a non-severe back impairment. The Commissioner has also offered additional bases to support the ALJ's decision that did not appear to have been offered by the ALJ himself. For example, after noting that Mr. Kummerow's August 2003 lumbosacral spine x-rays showed mild curvature of the upper lumbar spine and degenerative arthritic changes in the facet joints, predominantly in the lower facet joints, the Commissioner asserts that such degenerative arthritis is extremely common by age seventy, and almost everyone would show some pathologic change by age forty. But the ALJ did not rely on this proposition in deciding that Mr. Kummerow, who is only 46 years old, should be denied benefits. And "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003); *Curtis v. Barnhart*, 2003 WL 22389178 at 8 (N.D. Ill.)(finding that Defense counsel may not assert a *post hoc* rationalization for an ALJ's finding). Although the Commissioner's more thorough assessment

33

of the relevant medical records may fill in the gaps of the ALJ's analysis, the ALJ is responsible for rationally articulating the basis of his decision so as to confine this Court's review to the ALJ's analysis. *Steele*, 290 F.3d 936, 941 (7th Cir. 2002).

In his summary judgment motion, Mr. Kummerow challenges, on a number of grounds, the ALJ's findings about what jobs Mr. Kummerow could and could not do. At the hearing before the ALJ, Mr. Kummerow testified that, in his last job at BWD Automotive, he worked in the warehouse, filling orders using a load truck; he testified that, because of his injuries and restrictions, he could only work with the lighter weight products. Record at 275-76. When asked by the ALJ whether he could still do that type of work, he testified that he could, "as long as it's light work." Record at 276. Thus, whatever his injuries and his limitations, as of September 4, 2003, by his own admission, Mr. Kummerow still believed he could perform his past relevant work as an order filler, with a light exertional limitation. Indeed, he testified that his accident occurred in 1996, but that he worked until October of 1998, and even then, he quit not because of his injuries and restrictions, but because the company he worked for went out of business. Record at 276.

Mr. Kummerow also testified that he worked at Minnie's Machine after BWD, full-time, for a period of a year and a half. Record at 277. And, again, by his own admission, he left

34

Minnie's not because of his injuries, but because Minnie's "lost contracts for what I was doing, plus they were also moving the equipment out because they were going to close that facility." Record at 277.

To be fair, Mr. Kummerow also noted that his supervisors at Minnie's did not think he was "putting out enough." Record at 277. When asked whether he thought he could still do the work he did at Minnie's, Mr. Kummerow testified that he "probably could" if he "could find somebody to hire me." Record at 278. On further questioning from his attorney, however, he testified that, although he thought he could do those jobs, he admitted that his employer might not have agreed with that assessment. Record at 298. For example, he testified that Minnie's expected its lathe tenders to be able to pull 800 bars out of the lathe in an eight-hour day, but he could only do 300 to 400, "depending on how things ran." Record at 297.

In light of this testimony, it is tempting to find that Mr. Kummerow had the residual functional capacity to perform the types of jobs he performed at BWD and Minnie's, and to therefore affirm the ALJ's decision. But, significantly, despite the apparent admissions Mr. Kummerow made at the hearing, the ALJ did not conclude that Mr. Kummerow could perform his past relevant work as an order filler. Record at 21. Still more puzzling, after concluding that Mr. Kummerow was limited to unskilled jobs

involving only light exertional requirements, the ALJ determined
that Mr. Kummerow *could* return to his past work as a lathe tender
- a job that, at least according to the DOT was a semi-skilled
job requiring medium levels of exertion. Record at 19-21; *see
also* "Past Relevant Work Summary" prepared by VE Jennie Chen
(attached as Exhibit A to Mr. Kummerow's Memorandum in Support of
Summary Judgment). And the ALJ reached this conclusion without
even discussing Mr. Kummerow's unrebutted testimony that, when he
worked as a lathe tender, he was unable to meet his employer's
production requirements, which, according to the VE on whose
testimony the ALJ relies, would render him unemployable. *See*
Record at 315. At a minimum, given these apparent incongruities,
the ALJ should have explained how he reached the conclusions he
did, based on the evidence he had before him.

In his motion, Mr. Kummerow points out that the ALJ did not
include any limitation on skill level when instructing the VE;
and, in fact, it appears that the VE did not limit her analysis
with regard to skill level. Record at 305-07. Although he did
not discuss the matter when posing the hypothetical to the VE,
the ALJ determined in his decision that Mr. Kummerow could do
only unskilled work. Yet he also determined, based on the VE's
testimony, that Mr. Kummerow could perform his past relevant work
as a lathe tender, which the Dictionary of Occupational Titles
characterizes as a semi-skilled job requiring medium exertion;

36

this is entirely inconsistent with the ALJ's findings that Mr. Kummerow was limited to unskilled work at the light level, and, at a minimum would seem to require some explanation. Indeed, at least according to the DOT, the only job identified by the VE that would fall into the unskilled category is packager/handler, and that job is characterized as a medium exertion job, which therefore exceeds Mr. Kummerow's exertional limitations.

The Commissioner argues that, because Mr. Kummerow testified that his lathe tender job simply involved pushing buttons, but did not require him to set controls, it was reasonable for the ALJ to conclude that the job, as Mr. Kummerow performed it, was unskilled, rather than semi-skilled. And, if that was the basis for the ALJ's decision, then this Court would be hard pressed to disagree. But there is nothing in the ALJ's decision to suggest that he actually engaged in such an analysis; he did not discuss - let alone explain - the discrepancy.

Having said all of this, it is certainly possible that the ALJ will reach the same conclusion on remand as to Mr. Kummerow's disability. But, as written, the decision of the ALJ does not permit this Court to "trace the path of the ALJ's reasoning." *Halbrook v. Chater*, 925 F.Supp. 563, 571 (N.D. Ill. 1996)(quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). And the Court must, therefore, remand the matter.

37

## Conclusion

Because the ALJ's findings concerning what jobs Mr. Kummerow could and could not do are at odds both with his own findings and conclusions, and with the record evidence - including the evidence relating to Mr. Kummerow's back problems and back pain, as well as the testimony given by Mr. Kummerow and the Vocational Expert at the September 3, 2003 hearing, the Court must remand the matter for further proceedings. On remand, the Commissioner is directed to consider whether Mr. Kummerow's back problems - the injuries themselves and the pain resulting therefrom - would, in combination with his other ailments, affect his ability to work as a lathe tender or his ability to perform the other jobs identified by the VE and recited by the ALJ. The Commissioner is also directed to synthesize, to the extent necessary, Mr. Kummerow's residual functional capacity, with the requirements of the jobs she finds may be open to him.

Dated: April 25, 2005

E N T E R:

Arlander Keys

ARLANDER KEYS
United States Magistrate Judge